504

Rockingham
No. 92-200

## CHRISTINE G. WHEATON–DUNBERGER

v.

## ULF B. DUNBERGER

August 5, 1993

*Christine G. Wheaton*, by brief and orally, *pro se*.

*Patricia McKee*, of Exeter, and *Elizabeth Cazden*, of Manchester, on the brief, and *Ms. Cazden*, orally, for the defendant.

THAYER, J.    The defendant, Ulf Dunberger, appeals the Master's (*Stephanie T. Nute*, Esq.) child support order that was approved by the Superior Court (*Barry*, J.). The plaintiff, Christine Wheaton-Dunberger, argues that the marital master acted within her discretion. We agree and therefore affirm.

Prior to their marriage in 1983, the parties executed an antenuptial agreement providing that "neither shall be entitled to any alimony, or support money" derived from certain assets. Pursuant to this agreement, the plaintiff renounced any claim to the defendant's Swedish assets. The plaintiff obtained her master's degree in physical therapy during the course of the marriage and worked part-time. The defendant holds a master's degree in electrical engineering and was employed full-time during the marriage but was laid off while the parties were separated.

The plaintiff lived in the marital home during the separation, and the parties entered into a permanent partial stipulation that a property inspection would be done before the plaintiff vacated the marital home. Under the stipulation,

"[a]ny damages which the Defendant believes are beyond reasonable wear and tear, shall, if not able to be resolved by the parties, be brought to the attention of the Court and the Court shall make a determination as to the Plaintiff's liability for the repair and the costs thereof."

At the beginning of the divorce proceedings, each party was ordered to pay one-half of the guardian ad litem fees under a temporary decree. The permanent partial stipulation also included the following clause:

"The Defendant shall not be responsible for the Plaintiff's portion of the Guardian's bill as per Court orders to date. The Plaintiff will not seek a modification of the existing order relative to the Defendant's responsibility for payment of the Guardian's fees, but is free to challenge the overall Guardian's bill."

The parties were divorced in December 1991, effective May 13, 1991, based on irreconcilable differences. They agreed to joint physical and legal custody of their children but could not agree on a physical placement schedule, the amount of child support, or responsibility for medical insurance. Both parties waived their rights to alimony.

The plaintiff is establishing her own physical therapy practice and submitted a support affidavit showing a monthly gross income of $746. The defendant is working as a consultant, earning $3,776 per month, and receives dividends from his Swedish assets. In 1991, these dividends amounted to approximately $29,000. The plaintiff rents a house in the same neighborhood as the marital home, where the defendant now lives, and the master ordered that the parties would have physical custody of the children from Friday to Friday, on alternating weeks. The defendant was ordered to pay the plaintiff $950 per month in child support, and to provide medical insurance for the children. In addition, he was ordered to pay the entire balance owed to the guardian ad litem, and he was awarded $1,251.95 for damages to the marital home alleged to have been caused by the plaintiff.

Both parties moved for reconsideration. On March 3, 1992, the master vacated the paragraphs of the divorce decree regarding guardian ad litem fees and property damage to the marital home. The master ordered the defendant to pay all of the guardian ad litem expenses accruing after May 7, 1991, and the defendant's award of $1,251.95 for property damage was simply vacated. The master rejected the defendant's arguments to reduce child support, share the

children's medical insurance costs, impute an annual income of $40,000 to the plaintiff, order the plaintiff to file a joint tax return, and disregard his Swedish assets in awarding child support. The defendant raises these issues on appeal, as well as his claim that the marital master violated both the State and Federal Constitutions by imposing a support obligation "based solely or primarily on the gender of the parent."

■■ The master's determination of an appropriate award of child support will not be set aside absent an abuse of discretion. *Russman v. Russman*, 124 N.H. 593, 596, 474 A.2d 1017, 1019 (1984). With the adoption of the child support guidelines in 1988, the master's discretion to award support differing from the prescribed formulas is limited to situations in which the master finds special circumstances. RSA 458-C:4–:5 (1992); *see also Morrill v. Millard (Morrill)*, 132 N.H. 685, 687, 570 A.2d 387, 388 (1990).

The defendant's main arguments are premised on two grounds: (1) the master erred in not finding that the plaintiff's current earning capacity is $40,000; and (2) because the parties have equal physical custody of the children, instead of what the defendant contends is the more common situation where one party has primary physical custody of the children, the master should have made some adjustment to the amount of child support determined by the guidelines.

■ We conclude that the master's refusal to find the plaintiff had an earning capacity of at least $40,000 was supported by the evidence. The plaintiff's support affidavit reported a gross monthly income of $746, or approximately $9,000 per year. The defendant's insistence that the plaintiff is voluntarily underemployed, *see* RSA 458-C:2, IV(a) (1992), is based on the fact that a friend of the plaintiff offered her a job working in the Boston area for $40,000. The plaintiff, however, could not remove the children from the Portsmouth area without permission from the defendant or the court, and the parties had stipulated that the children would remain in the same school for at least one year. The prospective employer apparently thought such a long commute would have a negative impact on the plaintiff's work performance, and revoked the offer.

The defendant also contends that the plaintiff chooses to work only part-time, but he fails to recognize a physical injury that prevented the plaintiff from working during the summer of 1991, or her extensive testimony regarding her job search and willingness to accept a full-time position if a prospective employer asked her to close her own practice. Before her marriage, the plaintiff operated a success-

ful physical therapy practice, and she certainly has the skill to do so again. As the financial situation of the plaintiff improves, the defendant may seek modification of the court order.

The defendant next argues that the child support order is "unjust, confiscatory and unduly burdensome" because the master strictly applied the child support guidelines. The issue, as stated by the defendant, is "whether, once a party has unquestionably demonstrated that a 'special circumstance' applies, the court may nevertheless refuse to depart from the numerical guidelines in RSA chapter 458-C." Just as RSA 458-C:5 authorizes the master to exercise her discretion to adjust the support award under the formula, it also authorizes the master's exercise of discretion in *not adjusting* the support award.

■   The child support guidelines were adopted to promote uniformity in child support awards. RSA 458-C:1 (1992). Accordingly, there is a rebuttable presumption that the amount of the award resulting from the application of the guidelines is the correct amount of child support. RSA 458-C:4, II. A master, however, does not have to follow the guidelines strictly if such an application would be unjust or inappropriate in a given situation. *Id.* Under RSA 458-C:4–:5, the master can adjust the support award, either upward or downward, when the master makes a specific finding that the guidelines should not be followed.

■   The defendant argues that this case presents a special circumstance in that there is a split or shared custody arrangement. *See* RSA 458-C:5, I(h). As such, he argues that he should not be required to pay the full amount of monthly child support computed under the guidelines because he has custody of the children for one-half of the month. The defendant, however, is interpreting the statute to *require* an adjustment to a child support award upon a showing of special circumstances. The plain meaning of the statute evidences no such intent: "Special circumstances, including, but not limited to, the following, *may* result in adjustments in the application of support guidelines provided under this chapter." RSA 458-C:5, I (emphasis added).

The master fully addressed this argument in her ruling on the defendant's motion to reconsider:

"An equal sharing of custody does not automatically result in no order of support. Although in some cases the parents may share equal custodial time with the children, it is a rare circumstance in which both households are equivalent in terms of financial resources and needs. In this case, the fi-

nancial circumstance[s] and income of each party and each household [are] grossly unequal and dissimilar."

*See* RSA 458-C:5, I(b).

■ The master could reasonably have determined that in light of the need to provide the children with an adequate standard of living during the time in which they reside with the plaintiff, a downward adjustment of the child support order would have been inappropriate. Such a determination does not represent an abuse of discretion, and we will not overturn the order requiring the defendant to pay $950 per month in child support.

■ We now turn to the defendant's equal protection claim. He contends that in light of the fact that the parties had equal physical custody of the children, the master's determination that the defendant would be the obligor parent was based on his gender. The defendant argues that RSA chapter 458-C "provides no authority whatsoever" for a court to designate one parent as the obligor when both parents are custodial parents. This argument is based on RSA 458-C:1, I, which provides: "The custodial parent shall share responsibility for economic support of the children, irrespective of any non-custodial parent's child support order." The distinction between a custodial and a non-custodial parent, however, has nothing to do with the designation of which parent, if any, will be the obligor. The statute defines "obligor" as simply "the parent responsible for the payment of child support under the terms of a child support order" and makes no reference to which parent has physical and legal custody. RSA 458-C:3, VII.

In ruling on the defendant's motion to reconsider, the master explained: "The Defendant was designated as the 'obligor' only for purposes of the child support guideline calculation based upon the fact that the Defendant's financial resources are significantly superior to the Plaintiff's. The designation of the Defendant as 'obligor' has no relationship to his custodial award." The defendant was designated as the obligor on the basis of his income, not his gender. The record provides no support for his claim that the order violated his constitutional rights under the equal protection clauses of the State and Federal Constitutions.

The defendant next argues that the master abused her discretion in "disregarding the portion of the parties' antenuptial agreement concerning support based on income from premarital assets." The parties entered into an antenuptial agreement which provided that in the event that the marriage was legally terminated, "neither shall be

entitled to any alimony, or support money, derived from the properties listed herein as Attachment A." The master ruled that the value of the defendant's Swedish assets was not subject to discovery, but that the stream of income produced by those assets could be discovered. The defendant's financial records revealed a steadily increasing stream of income from a low of $3,898 in 1982 to a high of $29,144 in 1991.

In making the child support order, the master included $250 per month, or $3,000 per year, of the defendant's income derived from his Swedish assets. The defendant argues that "support money" referred to in the antenuptial agreement means child support, and that "there is no reason why [parents] should not be permitted to enter into a prenuptial agreement that specifies in advance how they will calculate child support in the event of a divorce." This argument is disingenuous, however, where the parties' antenuptial agreement would provide *no* child support from the Swedish assets if "support money" is read to encompass child support. The legislature has unambiguously addressed this issue:

> "A man and woman in contemplation of marriage may enter into a written *interspousal* contract . . . . However, no contract otherwise enforceable under this section may contain any term which attempts to abrogate the statutory or common law rights of minor children of the contemplated marriage."

RSA 460:2-a (1992) (emphasis added). Antenuptial agreements can only bind the prospective spouses/parents, as they are the only parties to the contract. Even if the parties intended to make their children parties to the antenuptial agreement, such language would not be enforceable in light of the statute. All of the defendant's assets could have been properly considered in setting the amount of the child support award. There was no abuse of discretion in including $250 per month from the income produced by the defendant's Swedish assets in calculating the amount of child support.

The final issue on appeal addresses four separate financial orders. The defendant argues that the master abused her discretion: (1) by ordering the defendant to be solely responsible for medical insurance; (2) by ordering the defendant to pay guardian ad litem fees that accrued after May 7, 1991; (3) by refusing to order the plaintiff to file a joint tax return; and (4) by refusing to order the plaintiff to reimburse the defendant for alleged property damage to the marital home. We will address these issues seriatim.

The master ordered the defendant to pay the premiums for the children's medical insurance; the defendant had requested that the cost of premiums be split evenly. Given the disparity in the parties' finances, we see no abuse of discretion in this order. *See Russman*, 124 N.H. at 596, 474 A.2d at 1018-19.

In March 1991, the parties stipulated that the defendant would not be responsible for the plaintiff's portion of the guardian ad litem fees "as per Court orders to date," and that the plaintiff would not seek a modification of the existing order that such fees be divided equally. The master, in response to the defendant's motion, revisited this issue. The defendant was ordered to pay all of the guardian ad litem fees accruing after May 7, 1991, a date approximately four months before the final hearing in September 1991. The fact that the master ordered a division of such fees at the beginning of the custody dispute in no way prohibits the master from altering the division of guardian ad litem fees throughout the course of the proceedings.

During the final hearing, the master explained that she ordinarily does not order parties to file joint tax returns because it may subject "a person unnecessarily to potential liability," and that absent a significant savings or refund, "if a person does not wish to file a joint return, I do not force them to do so." The defendant testified at the final hearing that he had yet to file tax returns for 1989 or 1990, and did not indicate that a joint return would result in significant savings. We see no abuse of discretion in the master's refusal to order the plaintiff to file a joint return with the defendant.

Finally, the defendant argues that it was an abuse of discretion for the master to refuse to order the plaintiff to pay for property damage to the marital home. The parties stipulated that the plaintiff would be responsible for damages to the marital home beyond reasonable wear and tear, as determined by the court. The defendant initially sought $10,000 from the plaintiff for damage to the marital home. The inspection report indicates significant storm damage, and work that needed to be redone due to faulty construction. The only cost that could reasonably be attributed to the plaintiff was for a stain on the hardwood floor caused when water leaked over plates that were placed under plants. The plaintiff testified that these plants had always been in the marital home, and that it was the defendant who put the plates under the plants. The defendant did not dispute this testimony. Accordingly, there was no abuse of discretion in vacating that portion of the original decree awarding the defendant $1,251.95.

Finding no abuse of discretion in any portion of the order, we affirm.

*Affirmed.*

All concurred.