879 A.2d 129 (2005)
379 N.J. Super. 385
Miriam R. BURSZTYN, Plaintiff-Appellant/Cross-Respondent,
v.
Enrique M. BURSZTYN, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2005.
Decided July 22, 2005.
*130 Bruce M. Pitman, Springfield, argued the cause for appellant/cross-respondent (Pitman, Pitman, Mindas, Grossman and Lee, attorneys; Mr. Pitman and Heidi V. Rivkin, on the brief).
Jay R. Atkins, River Edge, argued the cause for respondent/cross-appellant (Sunshine, Atkins, Minassian & Tafuri, attorneys; Mr. Atkins and Kristen Capogrosso, on the brief).
Before Judges A.A. RODRÍGUEZ, CUFF and WEISSBARD.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
In this matrimonial litigation, plaintiff Miriam Bursztyn appeals and defendant Enrique M. Bursztyn cross-appeals from an order of the Family Part awarding alimony to plaintiff, ordering the equitable distribution of marital assets and liabilities, tieing defendant's future obligation for college expenses of the parties' younger son to his relationship with the son, compelling plaintiff to execute joint federal and state income tax returns for the years 1999-2001, *131 and awarding counsel fees. We find no error warranting reversal and therefore affirm the judgment in all respects.[1]

THE FACTS AND THE COURT'S RULINGS
[At the court's direction, a portion of its discussion of the facts and the court's rulings has been omitted from the published opinion.]

BACKGROUND
Plaintiff, presently age fifty-six, and defendant, presently age fifty-three, were married on November 25, 1982. Two children were born of the marriage: Ian, presently age twenty-one, and Justin, presently age nineteen. In March 2000, after seventeen years of marriage, plaintiff filed for divorce.
Plaintiff holds a masters degree in psychology, and she has completed approximately twenty credits in post-graduate studies. However, plaintiff did not work outside the home at any point during the marriage. Plaintiff served as homemaker and primary caretaker of the parties' two sons.
Defendant, a radiologist, was the sole financial provider for the family.[2] When the parties met, defendant had completed his medical studies. He was working pursuant to a fellowship at New York Hospital/Cornell Medical Center.
When plaintiff filed for divorce, defendant was working as the medical director at Yonkers Imaging, P.C., in Yonkers, New York, a radiology center he had founded in or about 1987. Between approximately 1992/1993 and 1996, defendant also operated a second radiology center, Westside M.R.I., in Manhattan. However, Westside M.R.I. was never a significant part of defendant's income.
Yonkers Imaging operated pursuant to contracts with a management company. Under the contracts, Yonkers Imaging leased its building and equipment from the management company, and the management company was responsible for collecting on Yonkers Imaging's accounts receivable. Based upon those collections, and pursuant to the contract terms, the management company provided revenue to Yonkers Imaging. Defendant's remuneration was based upon formulas set forth in the contracts.
Defendant earned a substantial, albeit fluctuating, income from Yonkers Imaging. In the years leading up to the divorce, defendant's income significantly decreased due to reduced volume in accounts receivable and increased difficulty in collecting on accounts receivable  circumstances defendant attributed to changes in the medical marketplace in general, and particularly to the switch to managed care reimbursements. In addition, in the years leading up to the divorce, the contracts between Yonkers Imaging and the management company became less profitable for defendant, as the management company required Yonkers Imaging to bear costs which the management company previously had covered, including the costs of defendant's life, health, disability, and malpractice insurance, and the cost of employing replacement physicians while defendant was on vacation.
The record reflects the following adjusted gross (pre-tax) income reported by defendant *132 on his federal income tax returns, based upon the following gross (pre-tax) revenue reported by Yonkers Imaging, P.C. and Westside M.R.I., between the years 1993 and 2000 (the year plaintiff filed for divorce):

 Defendant's
 Adjusted Practices'
 Year Gross Income Gross Revenue
 ----------------------------------------------------
 1993 $389,190 $602,910[3]
 ----------------------------------------------------
 1994 $478,864 $661,059[4]
 ----------------------------------------------------
 1995 $593,811 $741,000[5]
 ----------------------------------------------------
 1996 $511,441 $732,900[6]
 ----------------------------------------------------
 1997 $397,277 $641,019
 ----------------------------------------------------
 1998 $281,656 $489,000
 ----------------------------------------------------
 1999 $429,397[7] $463,108
 ----------------------------------------------------
 2000 $509,623[8] $555,000

In 2001, defendant reported an adjusted gross income of $320,012. And, in 2002, defendant reported an adjusted gross income of $248,905, which was net of the $72,000 in alimony he paid to plaintiff.
During the marriage, and particularly in the years leading up to plaintiff's filing for divorce, the parties maintained a lifestyle which far exceeded their means. For example, the parties sent their sons to separate, expensive private schools in New York State. Ian attended the Dwight School in Manhattan, and Justin attended the Winward School in White Plains.[9] The parties also paid separate chauffeurs to drive the boys to school each day. Defendant estimated the total educational expenses, in 1998 and 1999, at between $60,000 and $80,000 per year.
The parties also hosted extravagant Bar Mitzvahs for their sons. In 1996, the parties spent approximately $95,000 for a Bar Mitzvah for Ian at the Waldorf Astoria Hotel. In 1999, they spent approximately $77,500 for a Bar Mitzvah for Justin.
In terms of vacations, the parties regularly took family vacations to Massachusetts (Martha's Vineyard and Nantucket), California, the Caribbean, and Uruguay (defendant's country-of-origin). In addition, the parties paid for their son Ian to take trips to Europe, Israel, and the Caribbean, and for both sons to attend various sleep-away camps. Finally, on one occasion, the parties took a trip to Europe without the children.
In terms of domestic help, the parties employed a live-in housekeeper, a gardener, a landscaper, a carpet cleaner, a window washer, a drapery cleaner, and a piano tuner. They also employed kitchen staff to assist them during major holidays.
The parties also spent large amounts of money on personal items. For example, between January 1998 and May 2000, the parties wrote approximately $344,000 in checks from one bank account, $134,000 of which was used to purchase jewelry. Also, *133 between January 1997 and May 2000, the parties charged approximately $140,000 on their credit cards. Finally, the parties had significant motor vehicle expenses, leasing two luxury vehicles which they replaced every three or four years.
Defendant's income was insufficient to support the spending habits described above. To finance their spending in excess of income, the parties: did not pay their full income tax obligations; took direct withdrawals from, and wrote personal checks on, defendant's business account; took loans on defendant's practice; made extensive use of their eighteen-to-twenty-four credit cards; took a home equity line of credit on the marital residence; took loans on defendant's life insurance policy, which they ultimately cashed in; and took distributions from defendant's profit sharing retirement plan. The parties had virtually no savings except for defendant's profit sharing plan.
In the final judgment of divorce, the court declared that the parties could not maintain the standard of living they had maintained during the marriage. The court concluded that the parties had supported their lifestyle, which was well beyond their means, only by denuding virtually all of their marital assets in order to satisfy their debts and liabilities.
. . . .

B. Marital Liabilities

1. Tax Liabilities. As mentioned previously, the parties financed their extravagant lifestyle, in part, by failing to pay their full annual income tax obligation. At the time of trial, the parties had satisfied their tax liabilities, including penalties and interest, through 1998.
For the years 1999 and 2000, however, the parties still owed: $243,000 to the federal government, $33,000 to the State of New York, and $17,900 to the State of New Jersey. These numbers represented principal only. The actual amounts owed would be significantly higher after interest and penalties were assessed by the relevant authorities.
As of the date of trial (July 2002), the parties had not filed tax returns for 1999, 2000, or 2001.[10] Plaintiff refused to file joint returns for those years. She gave no reason for her refusal, however, other than to state that she needed to consult with her attorneys.
John Miliotis, a joint expert on the resolution of tax issues, opined that in order to abate the interest and penalties, and ultimately resolve the parties' tax issues, it was essential that they file tax returns for 1999, 2000, and 2001. According to Miliotis, plaintiff's failure to sign the joint returns was preventing him from working on the parties' behalf. He further opined that, by filing joint returns for 1999, 2000, and 2001  i.e., "married, filing jointly," as opposed to "married, filing separately"  the parties would substantially decrease the amount of tax owed.
In the final judgment of divorce, the trial court ruled that the parties owed unpaid taxes and interest of approximately $370,000. The court ordered plaintiff to sign joint tax returns for the years 1999, 2000, and 2001, and ordered defendant to indemnify and hold plaintiff harmless for any allegations of fraud relating to those returns.
Post-trial, defendant moved to have alimony monies held in escrow until plaintiff executed the joint tax returns. The court *134 granted that motion. By consent order dated February 25, 2003, the court held that plaintiff had satisfied her obligation to execute the returns.
. . . .
[At the court's direction, its discussion of issues relating to alimony, equitable distribution, college expenses and counsel fees has been omitted from the published opinion.]

EXECUTION OF JOINT TAX RETURNS
Plaintiff appeals from the judgment requiring her to execute joint tax returns with defendant for the years 1999, 2000, and 2001, under penalty of the non-receipt of alimony.
With respect to the parties' tax issues, the trial court ruled as follows:
The Court heard and received extensive testimony from the parties CPA, Steven Wagner, that the couple owes personal income taxes for 1999, 2000 and 2001. Mr. John Miliotis, CPA testified that the couple might be able to compromise some of the tax liabilities through negotiation but must file returns and get current to do this. He estimated that unpaid taxes and interest are approximately $370,000. The Court orders the Plaintiff to sign the parties 1999, 2000 and 2001 tax returns. The Defendant will indemnify and hold Plaintiff harmless for any allegations of fraud per stipulation. In the event that Plaintiff fails to execute the returns 10 days after they are tendered the Defendant may apply to the Court to have all alimony payments held in escrow until Plaintiff has complied.
In the amended final judgment of divorce, dated January 24, 2003, the court again directed plaintiff to execute joint income tax returns for the years 1999, 2000, and 2001. The court also directed the Bergen County Probation Department to place plaintiff's alimony payments in a hold account until plaintiff executed the tax returns and discharged her share of certain outstanding bills. Approximately one month later, in a consent order dated February 25, 2003, the court noted that plaintiff had executed the relevant tax returns.
The court's authority to compel plaintiff to execute joint tax returns with defendant raises a legal issue which we review de novo. Manalapan Realty v. Tp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995). There is no controlling precedent in New Jersey, and other states are split on the issue.
First and foremost, we may view this issue as moot because plaintiff already executed the tax returns. See, e.g., In re Petition for a Declaratory Ruling Regarding the City of Plainfield's Park-Madison Site, 372 N.J.Super. 544, 550, 859 A.2d 1232 (App.Div.2004) (issues rendered moot by subsequent developments render legal issues abstract and outside proper realm of courts), certif. denied, 182 N.J. 630, 868 A.2d 1032 (2005). Therefore, we may choose not to address the issue. We could address the issue, however, if it is determined that the underlying issue was one of substantial importance, likely to reoccur, but capable of evading review. Zirger v. Gen. Acc. Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996).
We first considered this issue in Weinkrantz v. Weinkrantz, 129 N.J.Super. 28, 322 A.2d 184 (App.Div.1974). In Weinkrantz, the plaintiff contended that the Chancery Division had erred in requiring him to file a joint tax return with the defendant for the year 1972. Id. at 30, 322 A.2d 184. The parties were separated, and plaintiff had been making support payments to defendant since 1969. Ibid. We examined the Internal Revenue Code and *135 concluded that, under the circumstances presented, where the parties were separated but remained legally married, the parties were entitled to file joint tax returns. Id. at 31-36, 322 A.2d 184. Therefore, we found no error in the Chancery Division's order, compelling the parties to file joint federal income tax returns. Id. at 36, 322 A.2d 184.
Thereafter, in 1985, in Wadlow v. Wadlow, 200 N.J.Super. 372, 375, 378-80, 491 A.2d 757 (App.Div.1985), the plaintiff appealed from the Chancery Division's refusal to order the parties to file joint income tax returns. We first concluded that Weinkrantz was not controlling because there the court had not addressed the precise question raised by the plaintiff's appeal: whether the court was vested with the authority to compel the filing of joint income tax returns. Id. at 378-79, 491 A.2d 757.
Having identified the issue in Wadlow, we declined to address it. Instead, assuming that the Chancery Division had the authority to order the filing of joint returns, we found "no sound basis compelling that course within the context of the facts of this case." Id. at 379, 491 A.2d 757.
The court noted, on the one hand, the substantial tax savings that could result from filing joint returns. Ibid. On the other hand, the court noted that married individuals filing joint returns expose themselves to joint and several liability for any fraudulent or erroneous aspect of the returns' contents. Ibid. Although an indemnification agreement could resolve many of the potential liability issues, given those issues, we could "well understand the trial judge's reluctance to order the parties to file a joint return." Ibid. Therefore, we found no error in the trial court's refusal to compel the filing of a joint tax return. Id. at 379-80, 491 A.2d 757.
We further held, however, that the trial judge was not obliged to ignore the tax ramifications of his decision. "To the contrary, when determining an equitable division of property the court is free to consider the financial consequences of one party's refusal to file a joint return and grant an appropriate credit." Id. at 380, 491 A.2d 757. Thus, we indicated that under appropriate circumstances the trial court could hold a recalcitrant party liable for the tax savings lost due to that party's refusal to sign a joint tax return. Ibid.
Courts from other jurisdictions are split on the issue of whether parties in matrimonial cases may be compelled to file joint income tax returns. Some states' courts allow that result, noting their obligation to consider tax issues when equitably distributing marital property. Cox v. Cox, 17 Ark.App. 93, 704 S.W.2d 171, 173 (as part of court's equitable powers, court may compel parties to execute joint federal income tax returns), reh'g denied, 17 Ark.App. 93, 705 S.W.2d 902 (1986); In re Marriage of Lafaye, 89 P.3d 455, 461 (Colo.Ct.App.2003) (trial court acted within its discretion in ordering parties to file joint tax returns and precluding wife from amending previously filed joint tax returns), cert. denied (May 3, 2004); Schmitz v. Schmitz, 801 S.W.2d 333, 336 (Ky.Ct.App.1990) (court did not abuse its discretion in refusing to order parties to file joint tax returns), review denied (Feb. 6, 1991); In re Theroux v. Boehmler, 410 N.W.2d 354, 356 (Minn.Ct.App.1987) (it was within trial court's discretion and authority to require party to file joint tax return in order to avoid an unnecessary tax burden which would deplete funds available for support of family); Wheaton-Dunberger v. Dunberger, 137 N.H. 504, 629 A.2d 812, 817 (1993) (no abuse of discretion in marital master's refusal to order plaintiff to file joint tax return with defendant); Oldham *136 v. Oldham, 677 N.W.2d 196, 201-02 (N.D.2004) (trial court did not abuse its discretion in directing parties to file joint income tax returns); Bowen v. Bowen, 132 Ohio App.3d 616, 725 N.E.2d 1165, 1178-79 (trial court has discretion to order parties to file joint tax return), review denied, 86 Ohio St.3d 1402, 711 N.E.2d 231 (1999).
Other states' courts have held that matrimonial litigants cannot be compelled to file joint tax returns  particularly joint federal income tax returns  because individuals possess a right under the Internal Revenue Code to file either joint or separate returns, and that right cannot be taken away by a state court. See Kane v. Parry, 24 Conn.App. 307, 588 A.2d 227, 231-32 (1991) (trial court has authority to order a party to file a joint federal personal income tax return only if there was a prior agreement between the parties to do so); Leftwich v. Leftwich, 442 A.2d 139, 143-46 (D.C.1982) (married individuals have complete discretion under federal law to file separate return, or, with concurrence of spouse, a joint return); In re Marriage of Butler, 346 N.W.2d 45, 47 (Iowa Ct.App.1984) (since taxation laws give parties an option to file joint or separate returns, trial court should not have compelled them to file jointly), overruled on other grounds by In re Marriage of Wertz, 492 N.W.2d 711 (Iowa Ct.App.1992); Teich v. Teich, 240 A.D.2d 258, 658 N.Y.S.2d 599 (1997) (it is outside court's equitable powers to order parties to file joint tax returns because federal tax law gives each spouse unqualified freedom to decide whether or not to file joint return); Matlock v. Matlock, 750 P.2d 1145, 1145-46 (Okla.Civ.App.1988) (to permit trial court to order spouse to file joint return would be tantamount to removing right of election conferred upon married couples under Internal Revenue Code); In re Marriage of Lewis, 81 Or.App. 22, 723 P.2d 1079, 1080 (courts do not have authority to order spouses to file joint federal or state tax returns), review denied, 302 Or. 159, 727 P.2d 129 (1986). These courts also reason that there are less intrusive options for remedying any perceived disadvantage to filing separate income tax returns  for example, by altering the disposition of marital property. Leftwich, supra, 442 A.2d at 145-46; Teich, supra, 658 N.Y.S.2d at 599.
There are good arguments on both sides of the issue. Ultimately, however, we conclude that trial courts should have discretion to compel the filing of joint tax returns. In New Jersey, the Legislature has directed courts to consider the tax consequences of their rulings on alimony and equitable distribution. N.J.S.A. 2A:34-23(b)(12); N.J.S.A. 2A:34-23.1(j). Moreover, we have stressed the broad discretionary powers of the Chancery Division in matrimonial actions, even with respect to federal tax issues. Gwodz v. Gwodz, 234 N.J.Super. 56, 60-63, 560 A.2d 85 (App.Div.1989). Therefore, it seems reasonable that courts should consider the effect upon the marital estate of filing joint or separate tax returns, and, where appropriate, preserve the marital estate by compelling joint returns.
We do not find persuasive the argument that individuals have a federal statutory right to choose whether to file joint or separate income tax returns which may not be abridged by state courts. In matrimonial actions, courts routinely issue orders which have significant effects on individuals' rights. For example, courts may infringe upon a parent's right to relocate from one state to another. Baures v. Lewis, 167 N.J. 91, 770 A.2d 214 (2001). By contrast, limiting an individual's statutory right to choose between filing a joint or individual federal income tax return seems a minor intrusion.
*137 On the other hand, we are persuaded by the argument that there may be less intrusive options for remedying any perceived disadvantage to filing separate income tax returns. For example, courts may make up for a reduced tax savings by altering the equitable distribution of marital property. Leftwich, supra, 442 A.2d at 145-46; Teich, supra, 658 N.Y.S.2d at 599.
As a result, we hold that trial courts in New Jersey have discretionary authority to compel parties in divorce proceedings to file joint tax returns. Whether it is appropriate to compel that result will depend upon the facts presented in any given case. In general, we believe trial courts should avoid compelling parties to execute joint tax returns because of the potential liability to which the parties would be exposed, and because there generally exists a means by which to compensate the parties for the adverse tax consequences of filing separately.
Under the circumstances presented in this case, we perceive no abuse of discretion on the part of the trial court in compelling the parties to file joint returns. First, there was a significant financial benefit to filing joint returns and the Chancery Division had an obligation to consider the tax implications of its decision. N.J.S.A. 2A:34-23(b)(12); N.J.S.A. 2A:34-23.1(j). Filing separately would have unnecessarily depleted the funds available to support the family.
Second, there was no evidence that defendant had filed fraudulent returns in the past, or that defendant intended to file fraudulent returns for the subject years. Indeed, the tax returns were prepared by an independent expert, and defendant indemnified plaintiff with respect to the returns.
Third, defendant was the source of all income to be reported. Plaintiff had no income during the marriage, and, post-separation, her only income came from defendant's alimony payments.
Fourth, plaintiff has expressed no principled reason why she should file a separate tax return under the circumstances presented. In this regard, there is no merit to plaintiff's contention that she should not have been compelled to file joint tax returns with defendant for the year 2000, when she was separated from defendant for half the year, and for the year 2001, when she was separated from defendant for the entire year. In Weinkrantz, supra, 129 N.J.Super. at 31-36, 322 A.2d 184, we concluded that joint tax returns were permissible under such circumstances, and, based upon the factors cited above, joint tax returns were preferable to individual returns.
Fifth, because the large majority of marital assets were required to pay marital debts, there was little means by which the court could alter the equitable distribution in order to compensate defendant for the adverse tax consequences of filing separate returns.
Finally, we find no basis for disapproving the Chancery Division's link between plaintiff's executing the joint tax returns and plaintiff's receipt of alimony. In the court's post-trial decision, dated October 18, 2002, the court ordered plaintiff to execute joint tax returns for 1999, 2000, and 2001. The court ruled that, if plaintiff failed to comply with the court's order, defendant could apply to the court to have alimony payments held in escrow until such time as plaintiff executed the returns.
Plaintiff did not comply with the court's order, and defendant moved to compel compliance. Only thereafter, by order dated January 24, 2003, three months after the court's post-trial decision, did the court *138 rule that alimony would be held in escrow until plaintiff executed the joint tax returns.
We perceive no error in the court's rulings. Throughout these proceedings plaintiff has proven recalcitrant, refusing to comply with those orders with which she disagreed. In this particular instance, plaintiff had been given three months to comply with the court's ruling (between October 2002 and January 2003), but she chose not to do so. Plaintiff could have moved before us for a stay of the Chancery Division's orders pending appeal, but she did not. Under these circumstances, we find no error in the trial court's ruling that alimony payments be held in escrow until plaintiff complied with the court's order regarding tax returns.
Affirm on the appeal and cross-appeal.
NOTES
[1] We have truncated this opinion for publication purposes, deleting those portions which do not present novel issues.
[2] There was one minor exception. In 1981, prior to the marriage, plaintiff was injured in a car accident and received $50,000 in compensation. Plaintiff used this money to pay some marital expenses.
[3] $577,000 from Yonkers and $25,910 from Westside.
[4] $631,059 from Yonkers and $30,000 from Westside.
[5] $710,000 from Yonkers and $31,000 from Westside.
[6] $724,000 from Yonkers and $8900 from Westside.
[7] This figure includes a pension distribution of $151,000, which was used to pay business and personal expenses.
[8] This figure includes total pension distributions of $186,563.
[9] Justin began attending public schools in Leonia in the eighth grade. During the divorce proceedings, plaintiff enrolled Justin at the Dwight School in Manhattan. Defendant refused to pay, however, citing financial constraints. Therefore, as of the trial date, Justin continued to attend public school.
[10] Plaintiff stated that she had executed a 1999 joint return. However, no signed copy was presented to the court, and the record otherwise reflects that no returns were filed for that year.